IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **MARLA R. PHILLIPS,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Case No.: **3:09-cv-00367-PMF** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM AND ORDER

**FRAZIER, Magistrate Judge:**

This matter has been assigned to United States Magistrate Judge Philip M. Frazier pursuant to 28 U.S.C. 636(c) and Fed.R.Civ.P.73 for a Memorandum and Order. Plaintiff Marla R. Phillips ("Phillips") seeks judicial review of the final decision of the Social Security Administration ("SSA") denying her application for disability and disability insurance benefits filed on or about January 13, 2005. Phillips' application was denied by Administrative Law Judge ("ALJ") George Jacobs when he rendered a decision finding that Pound was not disabled (Tr. 13-27). That decision became final when the Appeals Council declined to review the ALJ's findings (Tr. 3-6). Judicial Review of the Commissioner's final decisions is authorized by 42 U.S.C. § 405(g).

For the reasons set forth below, **IT IS ORDERED AND ADJUDGED** that the final decision of the Commissioner of Social Security is **AFFIRMED**.

### I.   Findings of Fact

*A.  Procedural History*

Phillips filed a concurrent claim for Social Security Disability benefits ("SSD") and Supplemental Security Income benefits ("SSI") on January 13, 2005, alleging disability since

1

December 21, 2004 (Tr. 59-61 and 706-707). Her application was denied originally on July 22, 2005 (Tr. 42-46 and 701-705), and denied again after reconsideration on November 22, 2005 (Tr. 36-39 and 697-700). On January 17, 2006, Phillips requested an administrative hearing (Tr. 34 and 696).

A hearing was held on April 22, 2008 before an ALJ. By decision dated September 2, 2008, the ALJ found Phillips not disabled (Tr. 13-27). Ms. Phillips requested review of the ALJ's decision by the Appeals Council on September 24, 2008 (Tr. 12), and counsel submitted comments in support of her claim on December 30, 2008 (Tr. 717-727). On April 1, 2009, the Appeals Council denied the request for review (Tr. 3-6).

B. *Substantive History*

1. **Phillips' Medical History**

On November 23, 2002, Phillips was admitted to the hospital with depressive thoughts, death wishes, and suicidal preoccupations (Tr. 330). Her hospital course was noted for continued depressive symptoms and frequent statements of suicidal ideation. *Id.* She did not start to have decreased symptoms until December 4, 2002. *Id.* She was discharged the following day. *Id.* Phillips was diagnosed with major depressive disorder, recurrent, borderline personality disorder, obesity, and chronic pain. *Id.* Her medications were Paxil, Hydroxyzine, Trazodone, and Vioxx (Tr. 331).

Phillips was readmitted to the hospital 11 days later when she attempted suicide by taking 28 pills of Atarax, 25 pills of Trazodone, and slashing her wrists (Tr. 313). At admission her GAF[1] score was 20. Phillips was started on Lexapro and Luvox, and she gradually improved until she was stable for discharge on December 23, 2002. *Id.* M. Gospodinoff, M.D. diagnosed

---

[1] The Global Assessment of Functioning (GAF) scale is used in reporting of overall functioning. A GAF score of 11- 20 indicates some danger of hurting self of others, or gross impairment or communication. Diagnostic and Statistical Manual of Mental Disorders, 4th Ed. Text Revision ("DSM"), pg. 32-34.

major depressive disorder recurrent and severe with suicidal attempt, borderline personality disorder, and obesity (Tr. 313-314).

Phillips was again admitted to the hospital on July 7, 2004 for suicidal ideation and severe depression (Tr. 476). She remained an inpatient through July 15, 2004. *Id.* Dr. Hoyer noted that Phillips displayed almost no symptoms of depression, had chosen not to participate in the treatment opportunities made available, and "appear[ed] to be treating her hospital stay as more of a vacation than a treatment program (Tr. 486). It was noted that she was very reluctant to participate in psychological testing and found to have limited cognitive functioning. *Id.* She was started on Lexapro and diagnosed with major depressive disorder, recurrent, without psychosis, borderline personality disorder, and diabetes. *Id.*

In August 2004, state agency psychologist Dr. Schulman noted that Plaintiff had failed to follow through with her applications for benefits, and there was insufficient evidence in the record to find any medically determinable mental impairment (Tr. 632-44).

Phillips again attempted suicide in January, 2005, and was admitted to the hospital (Tr. 302). Dr. Gilbert-Johnson diagnosed her with major depressive disorder, recurrent; social anxiety disorder and borderline personality disorder (Tr. 303). He noted that "she likes to order things in a nice way in her kitchen but doesn't spend a long time doing that. However, she was diagnosed [in the past] because of this behavior with OCD which is questionable" (Tr. 306). He adjusted Plaintiff's medication, and at the time of her discharge three days later, she was "cheerful and not depressed or anxious, [and] had no suicidal ideation or psychotic symptoms"; Dr. Gilbert-Johnson assigned her a GAF score of 70 at that time (Tr. 302).

Phillips went to Egyptian Health in February, 2005 when she reported between mild and moderate distress (Tr. 229). She indicated that she did not need assistance with activities of daily living, but had difficulty with face-to-face interactions (Tr. 235). Social worker Bates diagnosed

3

her with major depressive disorder, recurrent with psychotic features, and borderline personality disorder, and assigned her a GAF of 45; she also found that Phillips had moderate impairment in her social functioning (Tr. 238-39). She recommended therapy and case management, as well as a psychological/psychiatric assessment (Tr. 240-41).

In March, 2005 Phillips was admitted to the hospital with homicidal ideation and auditory hallucinations (Tr. 293).  Dr. Gilbert-Johnson adjusted her medication and she was discharged three days later with a GAF of 75 (Tr. 294).  Later that month, psychologist Dr. Warshauer examined Plaintiff in connection with her application for benefits (Tr. 448-50).  She told him that she had been convicted of welfare fraud and denied substance abuse (Tr. 449).  He diagnosed her with depressive disorder and borderline personality disorder, the latter of which he described as quite severe (Tr. 450).  He assigned her a GAF of 45 (Tr. 450).

In May, state agency psychologist Dr. Hudspeth found that, based on her depressive disorder and borderline personality disorder, Phillips had mild limitations in her activities of daily living and in maintaining concentration, persistence or pace; moderate limitations in social functioning; and one or two episodes of decompensation (Tr. 411-23).  He opined that her cognition, memory and thought processes were intact, and that she would be "best suited in job tasks requiring no contact with the public, and minimal contact with coworkers and supervisors" (Tr. 427).

Dr. Chandra saw Phillips three times from June through December (Tr. 253-54).  Plaintiff also saw physician assistant Elsamahi in February, April, June and August (Tr. 393-97).  He noted anger, irritability and mood swings, with some reported improvement; he adjusted her medication (Tr. 393-97).

Phillips was admitted to the hospital in March, 2006 after a suicide attempt; she also reported hearing voices telling her to kill others and herself (Tr. 281, 283).  Her medication was

adjusted, and she "improved rather fast and the depression disappeared quickly" (Tr. 281). Phillips was discharged four days later6, at which time "her functioning . . . was good" (Tr. 281-82). Dr. Qureshi diagnosed her with major depressive disorder, recurrent; generalized anxiety disorder; and panic disorder with agoraphobia; and assigned her a GAF of 65 on discharge (Tr. 282). He also noted her borderline personality disorder (Tr. 282, 285).

In April, 2006 Elsammahi evaluated Phillips' mental ability to do work-related functions, even though he indicated on the form that he had treated Phillips into 2007 (Tr. 212). He wrote that she had severe anxiety, very frequent panic attacks, frequent depressive episodes, and was chronically tired and irritable; he also assigned her a GAF of 55 and noted her borderline personality disorder (Tr. 212). He found that she had essentially no limitations in the area of memory; a variable range of ability to maintain concentration and pace; mostly moderate to marked limitations in the area of social interaction; and mostly no to mild limitations in the area of adaptation (Tr. 215-17). He felt that Phillips was incapable of low stress work, and that she would be absent at least three times per month (Tr. 218-19). Elsamahi also wrote that Phillips could not function normally in public or around strangers; lacked the energy to attend work regularly; could not receive direction or instruction due to her irritability and anger; and could not tolerate normal workplace stressors (Tr. 259).

There is no record of any treatment at all in 2007.

In August, 2008 psychiatrist Dr. Handwerk completed a form entitled "Psychiatric/Psychological Impairment Questionnaire" (Tr. 174). She acknowledging that she had only treated Phillips over the span of roughly five months in 2007 on an "irregular" basis (Tr. 174). She based her opinions on Phillips' bipolar disorder, PTSD, panic disorder, generalized anxiety disorder and borderline personality disorder (Tr. 174). She assigned Phillips a GAF of 30 (Tr. 174). She noted that Phillips was severely depressed with suicidal ideation,

5

and she opined that Phillips had mostly marked limitations in the area of social interactions and the ability to maintain concentration and pace, as well as mostly mild limitations in the areas of adaptation and understanding and memory (Tr. 177-79). She felt that Phillips could not tolerate even low stress work due to her frequent decompensation (Tr. 180). She also opined that Phillips would miss at least three days of work every month (Tr. 181).

### 2. SSA Hearing

#### a. Phillips' Testimony

Phillips testified that she was twenty-eight years old as of the hearing (Tr. 734). She said she was a high school graduate and had experience as a certified nursing assistant and a housekeeper/cleaner in medical services (Tr. 736-37, 753).

Phillips testified that she was had arthritis, asthma, heart problems, difficulty breathing, and difficulty walking and standing (Tr. 738). She reported having pain in her knees, mainly when there were weather changes (Tr. 738-739). She alternated between using heat and ice to treat her pain, which helped "a little" (Tr. 741). Phillips stated that her weight put a lot of stress on her heart, and her asthma made breathing hard (Tr. 739). Phillips estimated that she could sit 2 hours total and stand or walk 3 or 4 hours total in an 8-hour workday (Tr. 747-748). She also reported that she was diagnosed with mental conditions of bi-polar disorder, borderline personality disorder, post-traumatic stress disorder, obsessive-compulsive disorder, generalized anxiety disorder, and agoraphobia, which impacted her ability to work (Tr. 741-742). As a result, she sometimes did not have the desire to get out of bed, did not take directions well or being criticized, and she had racing thoughts (Tr. 742). Phillips stated she was hospitalized 12 times for her emotional problems since 2002. *Id.* She reported having nightmares every night and flashbacks during the day related to her PTSD which were not precipitated by anything particular and took her hours to recover from (Tr. 749-750). Phillips described having anxiety

whenever something did not go the way she wanted it to, and while being around other people. She described having a racing heart and racing thoughts. *Id.* Phillips said she had suicidal thoughts "every day" (Tr. 751-752).

Phillips testified that she had been found unfit and lost custody of her two children roughly one month prior to the hearing (Tr. 734-35, 743). Phillips said that she typically got up around 9:00 in the morning because she didn't have her children, but used to get up at 7:00, get her son on the bus, and then went back to sleep (Tr. 743). She would then get up about an hour later and watch TV and fix her daughter lunch, after which she would take an afternoon nap (Tr. 744). When her son got home, Phillips would "try" to help her son with homework, give the kids a bath, and put them to bed. She then watched TV until her nighttime medicine "kicks in" before she went to bed. *Id.* Sometimes she had difficulty following the stories on TV (Tr. 747). Phillips went two or three days without bathing depending on how depressed she was (Tr. 745). She cooked about three times a week and did not do chores every day. *Id.* Phillips testified that her medications gave her a "very sedating" effect (Tr. 740). She stated that the sedation even affected her ability to understand what was going on at times. *ld.* Her doctor told her the side-effects were better than the high anxiety the drugs were used to treat (Tr. 741). Phillips stated that she did not drink alcohol, but admitted that she had smoked marijuana one month prior and also the previous August (Tr. 748).

### b. Vocational Expert's Testimony

The vocational expert testified that Phillips had no transferable skills to other work (Tr. 753). She stated that if an individual of Phillips age, education, and work history was limited to lift 10 pounds frequently, 20 pounds occasionally, sit for 6 hours in an 8-hour day, stand and walk for 6 hours in an 8-hour day, occasionally perform postural activities, never climb ladders, ropes, or scaffolds, avoid hazards of machinery and heights, fumes, odors, dusts, gasses, and

7

poor ventilation, perform simple, repetitive tasks with only occasional contact with co-workers and supervisors, and have no contact with the public, such an individual could not perform any of Phillips' past work (Tr. 753-754). However, the vocational expert stated that such an individual would be able to perform alternative work as a bulk filler, inspector, and assembler (Tr. 754). If such an individual were limited to lift 10 pounds frequently and occasionally, sit for 6 hours in an 8-hour day, and stand and walk for 2 hours in an 8-hour day, they could still work as a hand packer, bench hand, inspector, and assembler (Tr. 754-755).

The vocational expert testified that if a hypothetical individual were able to maintain concentration, persistence, or pace for less than 7 hours in an 8-hour day there would be no jobs available (Tr. 755). She also testified that if an individual were markedly limited in the ability to perform activities within a schedule and be punctual, the ability to interact appropriately with the general public and get along with co-workers and peers without distracting them, and would be absent from work more than three times a month, there would be no jobs available (Tr. 756). She added that her testimony was consistent with the Dictionary of Occupational Titles (Tr. 755).

## II.   Conclusions of Law

### A. *Legal Background*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive…."); *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); See also *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005) (a reviewing court is not allowed to substitute its judgment for the ALJ's by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility).

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1972) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002); *Green v. Shalala,* 51 F.3d 96, 101 (7th Cir. 1995). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Golembiewski*, 32 F. 3d at 915; *Cannon v. Apfel,* 213 F.3d 970, 974 (7th Cir. 2000). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex. rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

Disability insurance benefits are available only to those individuals who can establish a "disability" under the terms of the Social Security Act. The claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations enumerate a five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing a disability. 20 C.F.R. § 416.920. The ALJ must first consider whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. § 416.920(b). If he is, the claimant is not disabled and the evaluation process is over; if he is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). If the claimant's impairment is not severe, then the process is over, and the claimant is considered not disabled. If the finding is severe, however, the ALJ must proceed to step three.

At step three, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. § 416.920(d). If it does, then the impairment is

acknowledged by the Commissioner to be conclusively disabling. *Id.* However, if the impairment does not so limit the claimant's remaining capabilities, in step four, the ALJ reviews the claimant's "residual functional capacity" ("RFC") and the physical and mental demands of his past work. 20 C.F.R. § 416.920(e). If, at this fourth step, the claimant can perform his past relevant work, he will be found not disabled. 20 C.F.R. § 416.920(f). However, if the claimant shows that his impairment is so severe that he is unable to engage in his past relevant work, then the burden of proof shifts, at step five, to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(g). If either Plaintiff is determined not capable to perform other work or such work does not exist in the national economy, the ALJ will enter a finding that Plaintiff is disabled.

The law governing disability determinations provides that ALJs are not required to discuss every piece of evidence; however, they must build a bridge of logic connecting evidence to their conclusion. Regarding credibility assessments, they must articulate the reasons behind their evaluation. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). This standard is not high – only minimal articulation is needed – enough to allow a reviewer to follow the ALJ's thought process. Once the Court understands the ALJ's reasoning, it can determine whether the rationale has support in the administrative record and meets the applicable legal standard. When the ALJ does not minimally discuss or explain the reasons for rejecting evidence, the Court cannot initiate its review. The first step towards determining whether an adverse credibility decision is proper and supported is to understand the basis for the assessment; that is, to know why the ALJ discredited the evidence. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

### B. ALJ's Decision

After considering the evidence, the ALJ concluded that Phillips had severe impairments of diabetes mellitus, chronic bronchitis, arthralgia of the knees, obesity, depression, anxiety, and borderline personality disorder, but that none of her impairments, singly or in combination, met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix (Tr.20). He then determined that Phillips had the RFC to perform sedentary work with occasionally climbing stairs and ramps, balancing, stooping, kneeling, crouching, and crawling, but never climbing ladders, scaffolds, and ropes, and avoiding hazards such as machinery and heights, respiratory irritants, and limited to work that was simple, repetitive, had only occasional contact with co-workers supervisors, and no contact with the public (Tr. 18-25). Based on this RFC, the ALJ found that Phillips could not perform any of her past work, but could perform other work, including work of hand occupations, inspector, and assembler (Tr. 25-26).

### C. Analysis

Phillips raises three arguments in this appeal. The first argument is that Phillips is *per se* disabled under Medical Listing 12.04. The second argument is that the ALJ failed to follow the treating physician rule. The third and final argument is that the ALJ failed to properly evaluate Phillips' credibility. These arguments will be addressed individually.

#### 1. Medical Listing 12.04

Medical Listing 12.04 is titled "Affective Disorders." The listing states, in part, that these disorders are:

> "Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation. The required level of severity for these disorders is met when the requirements in both A and B are satisfied…"
>
> A. Medically documented persistence, either continuous or intermittent, of one of the following:

      1. Depressive syndrome characterized by at least four of the following:
          a. Anhedonia or pervasive loss of interest in almost all activities; or
          b. Appetite disturbance with change in weight; or
          c. Sleep disturbance; or
          d. Psychomotor agitation or retardation; or
          e. Decreased energy; or
          f. Feelings of guilt or worthlessness; or
          g. Difficulty concentrating or thinking; or
          h. Thoughts of suicide; or
          i. Hallucinations, delusions or paranoid thinking…

B. Resulting in at least two of the following:
      1. Marked restriction of activities of daily living; or
      2. Marked difficulties in maintaining social functioning; or
      3. Marked difficulties in maintaining concentration, persistence, or pace; or
      4. Repeated episodes of decompensation, each of extended duration…"
*20 C.F.R. Pt. 404, Subpt. P, App. 1.*

There is no indication from the record that the ALJ disputed that Phillips met the criteria established in part A of medical listing 12.04. Therefore, in order for Phillips to qualify as disabled under medical listing 12.04, she needed to establish that she suffered from at least two of the criteria established in part B. The ALJ addressed each of these four criteria in his decision. Specifically, the ALJ stated:

> "The first functional area is activities of daily living. In this area, the claimant has mild limitation. The evidence in the file and the testimony provided indicates that the claimant has the functional abilities to; care for herself, cook simple meals regularly, help her children with homework and keep them entertained, drive, buy groceries and clothing, manage money, and watch television. The claimant's daily activities are not limited to a degree consistent with a disabling level of impairment.
>
> The next functional area is social functioning. In this area, the claimant has moderate difficulties. The claimant testified that she has trouble dealing with people and interacting with others. Some of the evidence presented supports a finding that the claimant has some problems interacting with others and following instructions.
>
> The third functional area is concentration, persistence or pace. In this area, the claimant has moderate difficulties. The claimant stated that she likes to watch movies on Lifetime and she can usually follow the stories, but does have some

problems paying attention due to having racing thoughts. This statement appears to be supported by other data contained within the file.

The fourth functional area is episodes of decompensation. In this area, the claimant has experienced no episodes of decompensation" (Tr. 19).

Phillips argues that the ALJ erred in finding only moderate difficulties in the functional areas of social functioning and concentration, persistence or pace. The regulations state that "where we use "marked" as a standard for measuring the degree of limitation, it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." *20 C.F.R. Pt. 404, Subpt. P, App. 1*. As mentioned above, ALJs are not required to discuss every piece of evidence; however, they must build a bridge of logic connecting evidence to their conclusion. Regarding credibility assessments, they must articulate the reasons behind their evaluation. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). This standard is not high – only minimal articulation is needed – enough to allow a reviewer to follow the ALJ's thought process. From the ALJ's decision, it is clear that the ALJ found that Phillips had difficulty in the areas of social functioning and concentration, persistence or pace, but not so much as to be considered a marked difficulty. Thus, the Court finds that the ALJ built a sufficient bridge of logic by weighing the evidence presented, and therefore, did not err in finding only moderate difficulties in these functional areas.

Phillips also argues that the ALJ erred in finding no episodes of decompensation. Under the regulations, "the term *episodes of decompensation, each of extended duration* in these listings means three episodes within 1 year, or an average of once every four months, each lasting for at least 2 weeks." *20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00.C.4*. The record indicates that while Phillips was admitted to the hospital on four occasions over four years (Tr.

13

281, 293, 302, 476), on each occasion, she stayed only a few days (Tr. 281-82, 294, 302), with her longest stay being for about one week (at which time the psychologist noted that she was treating her stay more like a vacation) (Tr. 476, 486).  Additionally, there is no indication of extended decompensation in between Phillips' hospital visits.  Thus, the ALJ did not err in determining that Phillips did not experience any repeated episodes of decompensation, each of extended duration.

Therefore, because the ALJ did nor err in his analysis of the part B functional areas, he did not err in determining that Phillips did not meet the criteria established in medical listing 12.04.

### 2. **The Treating Physician Rule**

Phillips next argues that the ALJ failed to give "great weight" to the evidence provided by Phillips' treating physicians. *Bauer v. Astrue*, 532 F.3d 606 (7th Cir. 2008).  In *Bauer*, the Seventh Circuit stated that the ALJ was to give great weight to this evidence, unless it was "seriously flawed." *Id.*  Under 20 C.F.R. § 404.1527(2), if the ALJ finds

> "…that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

In this case, the ALJ clearly did not find that Drs. Elsamahi and Handwerk's opinions were consistent with other substantial evidence in the record.  Specifically, the ALJ stated that

> "… Mohamed Elsamahi, Ph.D., PA-C, at Harrisburg Counseling Center, LLC, wrote a letter indicating that the claimant has recurrent brief depressive episodes and occasional major depressive episodes that are severe.  She also has social anxiety disorder that impairs her social functioning.  The letter concludes that the claimant cannot hold an average job for a reasonable period of time (Ex. IF, p. 437).  Dr. Elsamahi's opinion letter is not consistent with the evidence contained within the file and thus little weight has been given to his letter.  Furthermore, this letter lacks any documentation or evidence to support the conclusion made within the letter and fails to provide any explanatory remarks for its position….Although

>Dr. Elsamahi concluded that the claimant was incapable of even low stress work, the evidence does not support this degree of limitations. While the evidence does support a finding that the claimant has some limitations in her ability to maintain social functioning and concentration, persistence, or pace, it does not support a finding that all work would be precluded" (Tr. 24). The ALJ continued, stating "the undersigned also points out that the signs and findings made by Dr. Handwerk, mentioned above, are not consistent with the weight of the evidence presented and are only based upon a 4 month period of treatment. Little weight has been given to this data due to the short period of treatment" (Tr. 25).

As stated above, an "ALJ's findings are supported by substantial evidence if the ALJ identifies supporting evidence in the record and builds a logical bridge from that evidence to the conclusion." *Giles ex rel. Giles v. Astrue,* 483 F.3d 483, 486 (7th Cir. 2007). In this case, the ALJ found that Drs. Elsamahi and Handwerk's opinions were inconsistent with other evidence in the record, and that little weight was given to Dr. Handwerk's findings because she had only been treating Phillips for a short period of time. The mere fact that the ALJ did not specify the particular evidence that contradicted Drs. Elsamahi and Handwerk's opinions does not necessarily mean that no logical bridge has been built. The administrative record must be read as a whole. In this case, the ALJ provided an extensive list of the evidence presented and considered, and concluded that because Drs. Elsamahi and Handwerk's opinions were inconsistent with this evidence, and because Dr. Handwerk had only treated Phillips for a short period of time, little weight would be given to their opinions.

Therefore, the Court finds that the ALJ did not err in building a satisfactory bridge of logic between the evidence presented in the entire decision, and the granting of little weight to Phillips' treating physicians.

### 3. **Phillips' Credibility**

Phillips final argument is that the ALJ erred in evaluating Phillips' credibility concerning her statements regarding the intensity, persistence, and limiting effects of her impairments.

15

When reviewing the ALJ's decision, a credibility assessment will stand "as long as [there is] some support in the record." *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

With respect to the ALJ's determination of Phillips' credibility, he stated that

"The undersigned finds that the presented signs, findings, and courses of treatment do not enhance the claimant's credibility. The undersigned notes that throughout the submitted evidence there is documentation indicating that the claimant admits to having used controlled substances; such as marijuana, (Ex. IF, pp. 212, 214), yet during the hearing the claimant initially stated that she had not used illegal drugs. A Comprehensive Mental Health Assessment performed on February 14, 2005, notes that the claimant indicated that she did not use illegal drugs (Ex. IF, pp. 248-261, duplicated at pp. 304-317, at pp. 415-428, and at pp. 454-467). However, during that same assessment, the claimant divulged rather personal information such as that: she lost her job in December, her car got repossessed, her driver's license was suspended, stress related to her child, relationship problems with her boyfriend, and she slit her wrist due to the break-up and was hospitalized due to the suicide attempt…" (Tr. 25).

There is sufficient evidence in the record to indicate that Phillips' evasion of her past drug use in her Comprehensive Mental Health Assessment despite her subsequent admission was the primary factor the ALJ used in assessing Phillips' credibility. Because there is "some support in the record" that Phillips' was evasive about her drug use, the Court will not disturb the ALJ's credibility finding.

Therefore, the Court finds that the ALJ did not err in making his credibility determination.

## Conclusion

For the reasons stated above, **IT IS ORDERED AND ADJUDGED** that the final decision of the Commissioner of Social Security is **AFFIRMED.**

**SO ORDERED.**

**DATED: February 19, 2010.**

                               s/ *Philip M. Frazier*
                               **PHILIP M. FRAZIER**
                               **UNITED STATES MAGISTRATE JUDGE**